FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 JUL -5 P 3: 19

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**WALTER RICHARD HOUSE, JR.**                         **CIVIL ACTION**

**VERSUS**                                                              **NO. 02-1342**

**AMERICAN UNITED LIFE INSURANCE COMPANY**      **SECTION "N"**

### REPORT AND RECOMMENDATION

The matter of calculating the damages due and issues inherent therein are before the undersigned Magistrate Judge pursuant to the reference of the district judge,[1] to wit: "[P]ursuant to 28 U.S.C. §636 and Local Rule 73.3E, this matter is referred to the assigned United States Magistrate Judge for preparation of a report and recommendation regarding the appropriate dollar amount of benefits, penalties, interest, attorney's fees and costs to be awarded in accordance with the Court's prior rulings in this matter."[2]  This Court's findings and recommendations are set forth below.

### I. BACKGROUND

This is an action on a policy of disability insurance bearing Certificate Number 46178808840 (the "Policy") effective May 1, 2000 to the plaintiff, Walter Richard House, Jr. ("House"), as Insured, by the defendant American United Life Insurance Company ("AUL").[3]

---

[1]*See* Minute Entry Order dated November 18, 2004 [Rec. Doc. No. 70].

[2]*Id.* (emphasis added).

[3]*See* Plaintiff's Complaint filed May 6, 2002 at para. 5, filed under 28 U.S.C. § 1332 (diversity) [Rec. Doc. No. 1].

1

___ Fee_____
___ Process_____
_X_ Dktd_____
_V_ CtRmDep_____
___ Doc. No._____

House, formerly a partner in the law firm of House, Kingsmill & Riess, L.L.C.,  filed this action

against  AUL claiming "totally disability" as of October 2, 2000, when he could no longer

perform the material and substantial duties of his regular occupation as a trial attorney.[4]

Alternatively, plaintiff claimed he became "partially disabled," and eligible for the maximum

monthly benefits under the Policy (*i.e.*, $10,000 per month).[5]   House further asserted that

penalties and attorney's fees are due and owing under La. R. S. 22:657 based upon the

defendant's arbitrary and capricious termination of benefits, unlawful delays in payment and

misrepresentation of the terms and conditions of its Policy.[6]

On December 3, 2002, Judge Engelhardt granted the plaintiff's motion for partial

summary judgment on the issue of "total disability." In this regard, the district judge concluded:

> Regardless of whether a *de novo* or arbitrary and capricious standard is
> used, a record this strong, including the uncontroverted opinion of House's
> treating cardiologist that he is presently disabled from his regular occupation (trial
> attorney), mandates a ruling in favor of the plaintiff. AUL's failure to obtain an
> IME, despite the urging of its own Medical Case Manager and awareness that an
> IME was a necessary predicate to the determination of House's current restrictions
> and limitations, cannot be ignored by the Court. The failure to get an IME was
> not an oversight.[7]   Neither  provisions of ERISA nor the lay opinion of a claims

---

[4]Complaint at para.6.

[5]*Id.*

[6]For a comprehensive discussion of the factual and procedural background of this matter,
see the district judge's December 3, 2002 and April 20, 2004 Orders and Reasons (Rec. Doc.
Nos. 21 and 60).

[7]*See* Report of Phone Contact by AUL's Senior Claims Analyst dated June 7, 2001
(noting that (1) "the IME has not been scheduled yet," (2) "we want to add one element to the
IME that the consultant be experienced with considering occupational stress", and (3) "we are
looking for his physical functional level *along with his ability to handle the stress of his regular
occupation*") [AUL 000262]; E-Mail by AUL's Steve Torrence dated April 12, 2002 ("[W]e
decided not to do an IME.  We contacted two cards [cardiologists] and both refused to do the

analyst on the import of selective medical test results provide concrete or
competent countervailing medical evidence.

       In summary, the policy at issue only requires proof that House is unable to
perform the substantial and material duties of his regular occupation.  The record
contains uncontroverted medical evidence supporting his "total disability" claim.
Further, there is no evidence in the record that House was capable of resuming
his regular occupation as a trial attorney after October 2, 2000, without adverse
and objectively demonstrated physical consequences.  AUL has not presented any
such evidence.  Applying the more rigorous *de novo* standard of review as
required, the Court can only find "total disability."  Nothing in the claims file
justifies AUL's decision that a change in circumstances warranted termination of
benefits.  The only changes that occurred after his bypass surgery were that House
reassigned his caseload, resigned from trial practice, and continued his follow-up
treatments with Dr. Cook, along with prescription drug therapy and cardiac
rehabilitation therapy. There is no evidence that the plaintiff recovered the ability
to perform his pre-disability occupation which consisted almost exclusively of
trial practice.  Indeed,  the record reflects that House continues (1) to take heart
medications as prescribed as modified from time to time by Dr. Cook, (2) to
strictly adhere to the course of follow-up treatment and care for his heart
condition, (3) to follow a regimen for cardiac rehabilitation which includes
strenuous physical exercise, and (4) to heed the proscription of his treating
cardiologist placing his lucrative but overly stressful (and thus, life threatening)
pre-disability occupation as a trial attorney off limits.

       Accordingly, partial summary judgment in favor of the plaintiff on the
issue of "total disability" is warranted.[8]

*Via* order dated May 23, 2003, the district judge determined that "total disability" benefits

under the House Policy are subject to offset by the amount of the earnings plaintiff received from

the Louisiana Department of Economic Development.[9]  The court explained that "the Schedule

of Benefits of the House Policy plainly states that the Monthly Benefit is a maximum amount of

_____

examination, (reasons unknown) and by that time the medical indicated he was ok from a cardiac
so we didn't think it would be of value.") [AUL 0000224].

    [8]*House v. American United Life Insurance Co.,* 2002 WL 31729483 ** 13-14 ( Dec. 3,
2002, E. D. La.).

    [9]*House v. American United Life Insurance Co.,* 2003 WL 21243502 * 2 (May 23, 2003,
E. D. La.).

$10,000, "*then reduced by Other Income Benefits,*"[10] which expressly includes "any earnings the Person receives from any other occupation or employment while the Person is Disabled and receiving a Monthly Benefit under the policy."[11]   In conclusion, the Court observed that:

> [T]he House Policy [] does not mandate payment of $10,000 in *disability benefits* each month under any and all circumstances.  In other words, the House Policy simply does not entitle Plaintiff to receive $10,000 per month in disability benefits regardless of the amount of monthly income he receives from other sources.  To the contrary, the House Policy plainly requires that the maximum amount of the disability benefits payable under the policy be reduced by income from alternative employment.[12]

In its order dated April 20, 2004, the court determined that the Plaintiff was entitled to receive the greater of the Total Disability or the Partial Disability benefits payable under the House Policy, but that he is not entitled to receive both.[13]  The Court again recognized that the terms "Total Disability" and "Partial Disability" as defined by the House policy are not mutually exclusive.[14]  The court further explained:

> Specifically, an insured could be unable to "perform the material and substantial duties of his regular occupation" on a full-time basis (*i.e.,* be Totally Disabled), but be able to earn "less than 80% of his Indexed Pre-Disability Earnings due to that same Injury or Sickness" by "performing at least one of the material and substantial duties ... of another occupation on a part-time or full-time basis" (*i.e.,*

---

[10]*House v. American United Life Insurance Co.,* 2003 WL 21243502 * 2 (May 23, 2003, E. D. La.) (*quoting* the House Policy, Section 1, p. 3 (emphasis added )).

[11]*Id.* (*quoting* the House Policy, Section 2, pp. 8-9).

[12]*Id.* at * 4 (emphasis in original).

[13]*House v. American United Life Insurance Co.,* 2004 WL 856671 * 3 (Apr. 20, 2004, E. D. La.).

[14]*Id.* at 3 (noting that in the court's May 27, 2003 Order and Reasons, an insured could be both Totally and Partially Disabled within the meaning of the Policy).

be Partially Disabled).[15]

The district judge found this to be precisely the situation in the case of House, to wit:

> Plaintiff's evidence establishes that he cannot perform every material and substantial duty of his regular occupation, *i.e.*, trial attorney, on a full-time basis. At the same time, however, he is performing at least one of the material and substantial duties of another occupation, that is, serving as Executive Counsel to the Louisiana Department of Economic Development, but because of the same Injury or Sickness that prevents him from performing every material and substantial duty of his regular occupation, is earning less than 80% of his Indexed Pre-Disability Earnings.[16]

Nevertheless, the court concluded that the House Policy contemplates payment of only one Monthly Benefit regardless of whether the Plaintiff is Totally or Partially Disabled or both, notwithstanding any offset. Accordingly, the district judge directed that the plaintiff must choose either Partial Disability benefits or Total Disability benefits, since he cannot receive benefits for both conditions.[17]

The court further determined that the doctrines of judicial admission and/or judicial estoppel did not operate to preclude the plaintiff's recovery of Partial Disability benefits, if he so chose at this stage of the proceedings. The district judge explained that the plaintiff pled alternatively both Total and Partial Disability and highlighted that the plaintiff has repeatedly emphasized AUL's failure to pay either benefit since September 30, 2001. Additionally, the court noted that the aforesaid terms are not mutually exclusive within the meaning of the policy

---

[15]*House v. American United Life Insurance Co.,* 2004 WL 856671 * 3 (Apr. 20, 2004, E. D. La.).

[16]*Id.* at * 4 (citations omitted).

[17]*Id.* at * 5.

or as applied in the plaintiff's particular case and further discerned no prejudice to AUL.[18]   The

court observed:

> Indeed, the Defendant has not even contended that it will be prejudiced, much less
> explained how it will be prejudiced, if Plaintiff is allowed to pursue his Partial
> Disability claim.  The Court certainly is not aware that Defendant has paid any
> Total Disability benefits as a result of the December 3, 2002 Order and Reasons or
> May 27, 2003 Order and Reasons.[19]

Finally and having first determined that the plaintiff's claim for disability benefits is not

governed by ERISA, the court determined that the plaintiff's state law claim for penalties and

attorney's fees under La. R. S. 22:657 is not preempted and that such relief is warranted in this

case.[20]  In this regard, the district judge referred to the factual statements and analysis in the

December 3, 2002 Order and Reasons, "as that explanation sufficiently demonstrates why a

penalty and an award of attorney's fees should be imposed against the Defendant."[21]

Notwithstanding that reference, the Court elaborated, to wit:

> Although Defendant has refused to accept Dr. Cook's assessment of
> Plaintiff's medical condition, it has never – not before and not since Plaintiff filed
> suit and sought summary judgment – provided a countervailing medical opinion
> or produced other contradictory medical evidence.  This fact is fatal to
> Defendant's argument that it denial of Plaintiff's claim was reasonable.
>     Particularly significant is Defendant's failure, contrary to the repeated
> advice of its own internal medical consultants, to obtain an IME.[22]

---

[18]*House v. American United Life Insurance Co.,* 2004 WL 856671 ** 5-6 (Apr. 20, 2004, E. D. La.).

[19]*Id.* at * 6.

[20]*Id.* at ** 7-11.

[21]*Id.* at * 11.

[22]*Id.* at * 13.

In sum, the court concluded that AUL "simply chose to deny Plaintiff's claim and then resort to generalizations and speculation when called to defend that conduct" and found that, "in acting in this manner, defendant was arbitrary and capricious in its handling of Plaintiff's claim."[23]   As to the arbitrary and capricious failure to pay any Partial Disability benefit, the court observed that AUL "never even bothered to respond to Plaintiff's counsel's query as to why he should not at least receive Partial Disability benefits" and, in any event, "for much the same reasons ... Defendant's failure to pay Partial Disability benefits to Plaintiff after he returned to work was similarly egregious."[24]   The court further emphasized that, "despite initially informing the Plaintiff that he was Partially Disabled, Defendant did not pay Plaintiff any disability benefits after September 30, 2001, and simply ignored Plaintiff's subsequent query regarding his entitlement to Partial Disability benefits."[25]

To recap, the following findings of fact and rulings by the district judge control the undersigned Magistrate Judge's findings and recommendations as to calculation of damages due in this case, to wit:

- AUL had not paid disability benefits to House since September 30, 2001;

- House is both Totally Disabled and Partially Disabled within the meaning of the Policy, but is only entitled to receive one Monthly Benefit and not both (Total and Partial Disability benefits);

- "Plaintiff presently is entitled to receive Total Disability benefits or Partial Disability

---

[23]*House v. American United Life Insurance Co.,* 2004 WL 856671 ** 21-22 (Apr. 20, 2004, E. D. La.).

[24]*Id.* at * 22.

[25]*Id.* at * 23,

7

benefits, subject to *applicable* offsets for income from other employments;"[26]

   • AUL was arbitrary and capricious in the handling of House's claim for disability benefits within the meaning of La. R.S. 22:657; and

   • Plaintiff's claim for penalties and attorney's fees under the aforesaid state law is not preempted by ERISA and such an award is appropriate under the facts and circumstances presented in this case.

   Fully reserving his right to appeal all aspects of the district judge's Order and Reasons, including, but not limited to the ruling that Total Disability benefits payable to Plaintiff are subject to reduction by his earnings from other employment, House has, for the "present," elected what he believes is the greater disability benefit available to him under the current law of the case, *i.e.*, Partial Disability benefits.[27]

## II. CONTENTIONS OF THE PARTIES

   Plaintiff highlights that, in calculating disability benefits due under the AUL Policy, only earnings that he receives from any other occupation or employment (1) while he is Disabled and (2) while he is receiving a Monthly Benefit under the policy may be set off.[28]   Plaintiff contends that for purposes of calculating Partial Disability benefits, his earnings do not meet the definition of "Other Income Benefits" for which set off is contemplated because by the clear terms of the Policy's definition, *i.e.*, offset of "Other Income Benefits" is only applicable to "earnings the

---

   [26]*House v. American United Life Insurance Co.,* 2004 WL 856671 * 22 (Apr. 20, 2004, E. D. La.) (emphasis added).

   [27]*See* Response of Walter Richard House, Jr. to Order to Inform the Court Whether He Presently seeks to Recover Total Disability or Partial Disability Benefits, filed April 30, 2004 (Rec. Doc. No. 63)

   [28]*See* House Policy at Section 2 page 9 (defining "Other Income Benefits" as "any earnings the Person receives from any other occupation or employment while the Person is Disabled and receiving a Monthly Benefit under the Policy").

Person receives from any other occupation or employment while the Person is Disabled *and*

*receiving a Monthly Benefit under the Policy.*" Plaintiff notes that he *received* <u>no</u> "Monthly

Benefit under the Policy" after September 30, 2001 (when benefits were terminated by AUL) and

the district judge so held, to wit: "Defendant has not paid disability insurance benefits to the

Plaintiff since September 30, 2001."[29]   Therefore, plaintiff contends that judgment should issue

awarding him:

(1)    a Monthly Benefit of $10,000.00, due and payable on the last day of each month from October 31, 2001, until House reaches age 66 on March 2, 2016 (Plaintiff's Social Security Normal Retirement Age), together with legal interest on each Monthly Benefit from its due date until paid;

(2)    Penalties of $10,000.00 per month due and payable on each Monthly Benefit that is not paid on the date it is due (which includes, without limitation, each and every Monthly Benefit prior to the date of judgment), together with legal interest on all penalties due prior to the date of judgment from the date of judgment until paid, and on all penalties due after the date of judgment from the date of the Monthly Benefit's due date until the penalties are paid;

(3)    Attorneys' fees in the amount of $175,000.00, together with legal interest from the date of judgment until paid;

(4)    Court costs in the amount of $1,689.03, together with legal interest from the date of judgment until paid; and

(5)    The total amount due on the date of judgment being subject to a credit in favor of AUL in the amount of $36,433.53, said amount having been unconditionally paid by AUL to House in January of 2004.

For its part, AUL also reserved its right to appeal the determinations of the district judge,

maintaining all prior objections to the district judge's rulings in the plaintiff's favor to date.

Solely for the purposes of the matters referred and utilizing the court's conclusion regarding

---

[29]*House v. American United Life Insurance Company,* 2004 WL 856671 * 1 (Apr. 20, 2004, E. D. La.).

9

partial disability, the defendant contends that the Policy clearly states the method of calculating Partial Disability benefits and conditions under which payments will cease. In this vein, AUL notes that it is undisputed that following the 90 day Elimination Period, during which no benefits were payable, it paid House nine (9) payments of $10,000 per month from January to September of 2001 (*i.e.*, the duration of the claims review process). These payments are retrospectively viewed as Return to Work Benefits paid "during the 12 month period beginning on the first day that Monthly Benefits are payable for Partial Disability."[30]  "Under this Return to Work Benefit, the Monthly Benefit for Partial Disability will not be reduced by earnings received, unless such earnings combined with income from all other sources, including the Monthly Benefit, exceeds 100% of the Pre-Disability Earnings. If the combined income exceeds this amount, the Monthly Benefit will be reduced by the amount that is in excess of the 100% of the Pre-Disability Earnings."[31]  Because plaintiff's monthly income ($7,891), when added to the Monthly Benefit ($10,000), exceeded his Pre-Disability Earnings ($16,666.67 per month) by $1,244.33, AUL argues that the monthly Return to Work benefit for October-December of 2001 should be reduced to $8,775.67.

Beginning in January of 2002, defendant submits that monthly benefits calculated according to the policy formula set forth in Section 8 of the Policy total $7,490 per month. It is AUL's position that the Partial Disability benefits in the amount of $7,490 per month are due only for the months of January and February of 2002 because the Participating Unit's policy was terminated on February 28, 2002 and served to terminate the plaintiff's partial disability benefits

---

[30]The House Policy, at Section 8, page 27.

[31]*Id.*

as of that date.  Accordingly, from October 2001 through February of 2002, AUL submits that

the plaintiff's Partial Disability benefits amount to no more than $41,307.01.

Defendant notes that on December 5, 2003, it issued a check to House in the amount of

$36,433.53 as payment of past due Total Disability benefits for the period of October 1, 2001 to

September 30, 2003, following the district judge's determination that the plaintiff was "totally

disabled" and entitled to past benefits less the contractual "Other Income Benefits"/earnings

offset.  Defendant explains:

> According to the Court's judgment, state law penalties would double the amount
> of the award.  With prejudgment interest and deducting the $36,433.53 previously
> paid, AUL argues that the total judgment, excluding attorney's fees, amounts to
> $51,568.94 [*i.e.*, (36,433.53 x 2 + prejudgment interest) less $36,433.53 equals
> $51,568.94].[32]

In 2004, AUL notes that, in a further effort to comply with the court's ruling, it issued

additional checks totaling $8,986.69 as Total Disability benefits owed for the period of October

of 2003 through April of 2004.  AUL argues that no penalty is due and owing beginning in

January of 2004, since at that time AUL had tendered the plaintiff all that was required under the

extant ruling (*i.e.*, House was entitled to Total Disability benefits, with offsets for Other Income

Benefits under the earnings' category).

AUL suggests that the fees claimed by the plaintiff should be greatly discounted.

Defendant buttresses its position by arguing that the amount of fees claimed is triple the amount

charged by defense counsel and roughly triple the amount of offset total disability benefits to

which the plaintiff was entitled under the court's initial ruling.  The defendant further argues that

---

[32]Defendant's Memorandum on Partial Disability Benefits filed May 20, 2004 at p. 3
(referring to Defendant's Exhibit 3 which assumes benefits terminate at the end of February
2002).

the parties took no depositions, conducted no out-of-state travel and engaged in no significant discovery.  AUL highlights the fact that all of the information necessary to prosecute this claim was contained in the administrative record provided by the defendant *via* Rule 26 initial disclosures at the outset of the case.  AUL notes that, "since the Court's May 2003 judgment," much of the litigation "involved plaintiff's retrenchment from a claim of total disability to instead claim partial disability."[33]  In light of that,  Defendant argues: "[I]t would be unfair, even as a penalty,  for the insurer to have to pay for plaintiff's pursuit of total disability benefits which, once won, were then abandoned, and to pay for plaintiff's subsequent pursuit of partial disability benefits."[34]

### III. ISSUES PRESENTED

(1)  Whether *all* of House's earnings during the period of his disability are deductible as "Other Income Benefits" – *i.e.*, whether earnings received while House was disabled but receiving no Monthly Benefit should be offset as "Other Income Benefits" in light of the House Policy's definition of "Other Income Benefits?"

(2)  Whether *all* "Monthly Benefits" under House's policy should terminate effective February 28, 2002,  when Kingsmill & Reiss, LLC terminated all three group policies?

(3)  Whether any penalties are due after AUL made an unconditional payment/tender of $36,433.53 in January of 2004?

(4)  Whether, under the circumstances,  attorney's fees in the full amount of $175,000.00 should be greatly discounted?

---

[33]*Id.* at p. 8.

[34]*Id.* at pp. 8-9.

## IV. ANALYSIS

### 1. Deductible Earnings from any other Occupation or Employment Are Limited to Those Earnings Plaintiff Receives *While* he is Disabled and Receiving a Monthly Benefit[35]

At the outset, the Court notes that the district judge previously held that: "Plaintiff presently is entitled to receive Total Disability benefits or Partial Disability benefits, subject to *applicable* offsets for income from other employments."[36]   General principles of insurance contract interpretation, as set forth by the court in *Clements v. Succession of Folse*, 830 So.2d 307 (La. App. 2nd Cir. 2002), govern this Court's conclusion regarding *applicable* offsets for Other Income Benefits.[37]

> An insurance policy is subject to the general rules of contract interpretation set forth in the Louisiana Civil Code.   The insurance policy is a contract, which constitutes the law between the parties.   When interpreting an insurance contract, courts must attempt to discern the common intent of the insured and insurer. Courts begin their analysis with a review of the words in the insurance contract. *Words in an insurance contract must be given their generally prevailing meaning; however, words of art or technical terms must be given their technical meaning. Courts must enforce the insurance contract as written when the words are clear and explicit and lead to no absurd consequences.*  However, if the insurance contract's provisions are ambiguous, the courts will construe the ambiguous provision against the insurer who prepared the insurance contract's text and in favor of the insured.  Furthermore, absent a conflict with statutory provisions or

---

[35]House Policy, Section 2 "Definitions," at p. 0009 ("Other Income Benefits are ... any earnings the Person receives from any other occupation or employment while the Person is Disabled and receiving a Monthly Benefit under the policy.").

[36]*House v. American United Life Insurance Co.,* 2004 WL 856671 * 22 (Apr. 20, 2004, E. D. La.) (italicized emphasis added).

[37]As aforestated, the district judge previously determined that Louisiana law applies – not ERISA. However, in light of the precise policy terms set forth in the House Policy's definitions, which inform the policy's insuring provisions, this Court is of the opinion that the result would likely be the same under ERISA.

public policy, the insurance policy must be enforced as it is written.[38]

Generally speaking, the district court previously noted that the purpose of the disability insurance agreement is to achieve a guaranteed monthly income amount for the duration of a period of disability covered under the Policy.  Indeed, in *Nesom v. Brown and Root, USA, Inc.,* 987 F.2d 1188, 1193 (5th Cir. 1993), the Fifth Circuit, recognized the validity of offsetting certain benefits and explained that the setoff provision integrates benefits from several sources to achieve a guaranteed monthly income amount.

However, the "earnings" category of "Other Income Benefits" defined at Section 2, subsection 8 on page 9 of the House Policy defines "Other Income Benefits" as "any earnings the Person receives *while*[39] he is Disabled *and receiving a Monthly Benefit under the Policy.*"[40] This clause specifically defines  "earnings" that qualify as "Other Income Benefits;" therefore, earnings from other employment that the insured receives while he is Disabled **but is receiving no Monthly Benefit** falls outside of the ambit of  deductible "Other Income Benefits." Additionally, such earnings do not qualify as "Other Income Benefits" under the definitions set forth in subsections one through seven.[41]

---

[38]*Clements v. Succession of Folse*, 830 So.2d 307, 312 (La. App. 2nd Cir. 2002), *cert. denied*, 829 So.2d 437 (La. 2002) (citations omitted).

[39]The conjunction "while" is defined as and commonly understood to mean "during that time."  Merriam-Websters Collegiate Dictionary, at p. 1342 (10th ed. 2002).

[40]House Policy at Section II "Definitions," at p. 0009 (emphasis added).

[41]*Id.*, at pp. 0008-0009.

Construing the defined term  – "Other Income Benefits" as "any other earnings... the Person receives while Disabled and receiving a Monthly Benefit" – it is difficult to ignore the limiting clause – "while  the Person is ... receiving a Monthly Benefit."[42]  AUL would have this Court delete this limiting clause as mere surplusage, notwithstanding its peculiar insertion as a *defining* clause solely in subsection 8, which applies only to "any other earnings."

In this regard, the House Policy ("Own Occupation Coverage" available to Partners only) clearly recognizes and addresses the financial predicament in which House eventually found himself  – *i.e.*, Totally Disabled within the meaning of the policy, receiving <u>no</u> Monthly Benefit for over two years,  his earning capacity greatly diminished and ineligible for either Social Security or Workers' Compensation benefits with constant and/or rising expenses.  It comes as no surprise that there is a *quid pro quo* built into the policy definition directly addressing the unenviable circumstance which may and did in fact  inure to the detriment of the Disabled partner-insured in question.   Subsection 8 "earnings" the insured receives from any other occupation or employment while he is Disabled **but receiving no Monthly Benefit** are not defined by the House Policy as "Other Income Benefits;" therefore such earnings may not be deducted/offset as "Other Income Benefits" *as defined by the House Policy.*  Simply stated, the House Policy does not provide for integration/coordination of "Other Income Benefits," which fall outside of the ambit of the policy's definition of that term.

It is this Court's opinion that the foregoing is not inconsistent with the district judge's prior rulings.  As aforestated, the district judge held that the "Plaintiff presently is entitled to receive Total Disability benefits or Partial Disability benefits, subject to *applicable* offsets for

---

[42]House Policy Section II Definitions, at p. 0009.

income from other employments."[43]   The district judge did not address the particular

circumstances or argument presented to this Court, regarding the specific period of twenty-six

(26) months from October, 2001 to December, 2003, during which the then "totally disabled"

insured *received no Monthly Benefit* at all.   The court's prior opinions do not specifically address

the *limiting language in the House Policy definition* of other earnings in light of the reality of the

Monthly Benefit hiatus which occurred in this case.   Moreover, the court instructed the

undersigned to calculate the benefits owed applying the appropriate deduction for earnings as

applicable.[44]

   With the exception of *Levinson*,[45] all of the cases cited regarding "integration of benefits"

involve *entitlement* to benefits under worker's compensation and/or social security law and not

earnings received from other occupation or employment.[46]   As to the Seventh Circuit's case,

---

[43]*House v. American United Life Insurance Co.,* 2004 WL 856671 * 22 (Apr. 20, 2004, E. D. La.) (emphasis added).

[44]The undersigned Magistrate Judge notes that this is not the only substantive issue raised post-summary judgment.  AUL itself belatedly raised the issue of the limitation on coverage of Partial Disability, *i.e.*, it ends upon termination of the Participating Unit.  It is apparent that the district judge was not permitted the "first crack" at either of these two substantive issues involving the House Policy's definitions and limitations of coverage.  Both first arose in the context of the damage calculation, but turn on quite precise definitions and limitations articulated in the House Policy.  Indeed, there would have been no need to entertain the hollow exercise of an election had the issue of "termination" been raised in the context of one of the numerous motions for summary judgment filed with the court.

[45]*Levinson v. Reliance Standard Life Insurance Company,* 2000 WL 193623 at * 8 (S. D. Fla.), *affd,* 245 F.3d 1321 (11th Cir. 2001).

[46]*See Nesom v. Brown & Root, U.S.A., Inc.,* 987 F.2d 1188, 1193-1195 (5th Cir. 1993) (allowing recoupment of retroactive lump sum award of worker's compensation benefits *via pro rata* reduction of *future* benefits subject to the minimum monthly benefit); *Godwin v. Sun Life Assur. Co.,* 980 F.2d 323, 327-29 (5th Cir. 1992) (recognizing offset for social security and workers' compensation benefits); *Hyde v. Hyde,* 697 So.2d 1061, 1065 (La. App. 1st Cir. 1997)

*Levinson*, the court did in fact allow a reduction in disability benefits to account for annual salary.[47] However, according to the district judge's opinion, the policy defined "Other Income Benefits" as "wages or other compensation" that the disabled insured "*is entitled to receive* excluding the amount allowable under the 'Rehabilitation Provision.'"[48] The aforesaid policy definition of "Other Income Benefits/earnings" set forth in the *Levinson* case differs significantly from the House Policy definition, which <u>specifically limits</u> the meaning of "earnings" deductible as "Other Income Benefits" to "any earnings the Person receives from any other occupation or employment *while the Person is* Disabled <u>and receiving a Monthly Benefit under the policy</u>."[49] This Court is not persuaded by AUL's argument that the precise issue before this Court was decided by the district judge or that the defining clause at issue is otherwise effete.

Unquestionably earnings from House's present occupation or employment for the period of from December 1, 2003 to date are subject to offset as "Other Income Benefits," as the district judge held. During this later period of time, the plaintiff was Disabled and *received* AUL's unconditional tender of benefits under the policy; thereafter, plaintiff received, refused and returned several Monthly Benefit checks, fully indicating to AUL that tender of less than $10,000.00 a month would be a vain and useless effort. Under the circumstances, AUL should not be penalized for the plaintiff's refusal of the Monthly Benefit tendered under the then

---

(recognizing offset for social security benefits); *Houston Fishing Tools v. Windham*, 619 So.2d 1224, 1228-29 (La. App. 3rd Cir. 1993) (same).

[47]*Levinson v. Reliance Standard Life Insurance Company*, 2000 WL 193623 at * 8 (S. D. Fla.), *affd*, 245 F.3d 1321 (11th Cir. 2001).

[48]*Levinson*, 2000 WL 193623 at * 8.

[49]House Policy at Section 2, p. 0008-0009 (emphasis supplied).

prevailing law of the case.

## 2. "Termination" of the Policy and the "Extended Benefit"

As noted the outset, AUL argues that its obligation to pay partial disability benefits

ceased when the Kingsmill & Riess law firm (the Participating Unit) terminated its relationship

with AUL.  It contends that, once the Participating Unit terminated its relationship with AUL,

under Louisiana Revised Statute 22:215(A), the defendant  was only obligated to pay benefits

that had accrued prior to the date of termination, *but no partial disability benefits after that date*.

At the outset the Certificate of Insurance issued to the plaintiff provides:

Insured: **House, Jr., Richard W**.                                **05/01/2000**
Certificate Number: **4617880840**

                                                        Change Effective Date
Coverage for Dependents: **Not Included**          Member: **05/01/00**
                                                        Group:   **Does Not Apply**

*House, Kingsmill & Riess LLC*
Shall participate in coverage as a Participating Unit
Participating Unit Number:  00603172-0000-000[50]

AUL highlights the fact that the certificate of insurance provides that:

This certificate describes the coverage provided in the Group Policy.  The Group
Policy determines all rights and benefits in this certificate and may be amended,
cancelled, or discontinued at any time by agreement between AUL, the Group
Policy Holder [Peoples Bank & Trust Co, Trustee for the AUL Group Insurance
Trust] and the participating unit [*House, Kingsmill & Reiss LLC*].[51]

It is uncontested that the participating unit, Kingsmill & Riess, LLC, terminated its

relationship with AUL."[52]  Defendant also directed the Court's attention to AUL's

_____

[50]*See* Certificate of Insurance at p. 0001 (underlining emphasis added).

[51]*Id.*

[52]*See* Defendant's Supplemental Memorandum on Partial Disability Benefits, at p. 4 note
2 (quoting Certificate of Insurance Number 4617880840 at p. 0001).

correspondence referencing "Group Policy G 603172," acknowledging the Participating Unit's decision to terminate group coverage and noting that "Group Policy G 603172 terminated effective midnight, February 28, 2002."[53]

With respect to "Termination of a Participating Unit," Section 5 of the House Policy provides in pertinent part as follows:

> Insurance for a Participating Unit ceases on the EARLIEST of the following dates:
> 1. the date the Participating Unit no longer meets the definition of a Participating Unit;
>                                        * * *
> 5. the date ending the Coverage Month for which the last premium payment is made for the Participating Unit's insurance; or
> 6. at the end of a Coverage Month, provided that AUL has given at least 60 days prior written notice to the Participating Unit;
> 7. *at the end of a Coverage Month, if the Participating Unit has given AUL at least 31 days prior written notice;*...
>                                        ***
> If a Person's insurance is terminated due to the termination of a Participating Unit, the Person's rights under the policy are determined as if the policy had terminated on the date that the Participating Unit's coverage terminated.[54]

As to "Individual Termination," the House Policy provides in pertinent part that:

> A Person will cease to be insured on the EARLIEST of the following dates:
> 1. *the date the policy or the Participating Unit's coverage under the policy terminates;*
> 2. the date the Person is no longer in an eligible class;
> 3. the date the Person's class, as elected on the Schedule of Benefits, is no longer insured under the policy;
>                                        ***
> 6. the date employment terminates. Cessation of Active Work will be deemed termination of employment. However, the insurance will be continued for a Disabled Person during:

---

[53]*See* Correspondence of Stephen Matelic/AUL Policyholder Service Specialist dated April 12, 2002 (RE: Group Policy G 603172) [Rec. Doc. No. 67/Exhibit 1].

[54]House Policy, at Section 5, p. 0015 (italicized emphasis added).

    a. the Elimination Period; and
    b. the period during which premium is being waived;....[55]

More particularly addressing the instance of termination of coverage for a Participating

Unit, the policy at issue further provides that "[t]ermination of the policy or termination of

coverage for a Participating Unit, under any conditions will be without prejudice to any claim

originating prior to termination."[56]

As to any "Extended Benefit" for "Disability," the policy language is clear and leaves no

room for an election. In this regard, the House Policy specifically sets forth the following

imperative, to wit:

> EXTENDED BENEFIT: If the Person is Totally Disabled on the date of
> termination of insurance *AUL **will pay benefits for Total Disability***:
> > 1. after the Elimination Period has been met, if the Person is not already
> > receiving a Monthly Benefit;
> > 2. during the uninterrupted continuance of the same period of Total
> > Disability; and
> > 3. subject to the provisions and benefits of the policy as elected by the
> > Participating Unit and shown on the Schedule of Benefits.
>
> Benefits will be extended to the EARLIEST of the following:
> > 1. the date earnings received from any occupation or employment equal or
> > exceed 80% of the Indexed Pre-disability Earnings;
> > 2. the date that the Person ceases to be Totally Disabled;
> > 3. the date the Person dies;
> > 4. the date the Maximum Benefit Duration shown on the Schedule of
> > Benefits page is completed;
> > 5. the date the Person fails to give AUL required proof of Total Disability....[57]

---

[55]*Id.* (italicized emphasis added).

[56]House Policy at Section 5 entitled "Terminations", at p. 0016 (all emphasis added).

[57]*Id.* The duration of the Extended Benefit mirrors that set forth in Insuring Provisions
under the subsection entitled "Termination of the Monthly Benefit." *Id.* at Section 8, p. 0025.

As aforestated, plaintiff argues that group coverage as defined by the various insuring provisions discussed above does not exist;  rather, House contends that he was insured under an individual long term disability policy.  Plaintiff highlights one unexplained  heading comment in the certificate of insurance, which states "group does not apply" and asks the Court to ignore all of the pertinent  insuring provisions, conditions precedent to coverage, and limitations on coverage set forth in the policy/insurance certificate.  The Court declines.  Review of the policy provisions reiterated above reveals that the policy states with sufficient clarity all of  the permutations and limitations on coverage applicable to partial and total disability.

The one comment, "group: does not apply," most apparently refers to either or both of the facts that (1) Class 1 LTD coverage – available to partners only –  was separate from the group coverage available to employees/non-partners with premiums paid 100% by the House law firm and (2) the Class 1 LTD policy provided individualized coverage amounts in that each partner's benefit was calculated based upon his own average earnings over a three year period predating the onset of disability.   House also contends that the facts that the employer was required to contribute at least 25% of the premium for a *covered person* under the Group LTD coverage and that, by design, the House firm paid 0% of the partner's LTD premiums in the event that a partner opted to purchase a Class 1 LTD Policy, militate against the a determination that the House Policy constitutes "group coverage."  This argument ignores the fact that House was at all pertinent times a partner.  Essentially, plaintiff seeks a wholesale reform of the coverage terms discussed below and asks this Court to turn a blind eye to the fact that he applied for the coverage under the group name House, Kingsmill & Riess, LLC, a partnership.

AUL points out that "group insurance" has a plain meaning, *i.e.*, any insurance obtained

through a group.  AUL issued a Class I LTD policy (Group Policy numbered AULtimate LTD1E)

to the Peoples Bank & Trust Company.[58]  House purchased insurance through the "group name,

House, Kingsmill & Riess LLC,"[59] and the AUL Policy/Certificate of Insurance bears the

inscription "Group Long Term Disability Insurance."[60]  This insurance is not just "group

insurance" in the sense that the policy itself was made available and subscribed to by all partners

of the House firm; rather, it is also "group insurance" in the sense that it involved several parties,

including a participating unit (House, Kingsmill & Riess, LLC), the insurer (AUL) and the

central entity/policy holder (Peoples Bank & Trust Company).   For these reasons, as explained

below, this Court finds the defendant's argument more persuasive.

Well-established general rules of insurance contract interpretation  govern this Court's

conclusion.  An insurance policy is subject to the general rules of contract interpretation set forth

in the Louisiana Civil Code.[61]   The insurance policy is a contract, which constitutes the law

between the parties.[62]   When interpreting an insurance contract, courts must attempt to discern

---

[58]See Certificate of Group Long Term Disability Insurance issued to House, effective
5/01/00 at p. 0001.

[59]*Id.,* at Coverpage and p. 0001.

[60]*See id.,* at p. 0001 (further certifying that the Person whose name appears on the
certificate and for whom the required premium has been paid is insured under the "Group
Policy").

[61]*See Succession of Fannaly v. Lafayette Ins. Co.*, 805 So.2d 1134, 1135 (La. 2002).

[62]*See Marcus v. Hanover Ins. Co., Inc.*, 740 So.2d 603, 606 (La. 1999).

22

the common intent of the insured and insurer.[63]   Courts begin their analysis with a review of the words in the insurance contract. Words in an insurance contract must be given their generally prevailing meaning; however, words of art or technical terms must be given their technical meaning.[64]   Courts must enforce the insurance contract as written when the words are clear and explicit and lead to no absurd consequences.[65]   However, if the insurance contract's provisions are ambiguous, the courts will construe the ambiguous provision against the insurer who prepared the insurance contract's text and in favor of the insured.[66]   Furthermore, absent a conflict with statutory provisions or public policy, the insurance policy must be enforced as it is written.[67]

In *Clements v. Succession of Folse*, 830 So.2d 307 (La. App. 2nd Cir. 2002), the appellate court noted the Louisiana Supreme Court's definition of a group policy and discussed the nature of the relationships of the parties in a group policy, to wit:

> In *In Re Louisiana Health Service and Indem. Co.*, 98-3034 (La. 10/19/99), 749 So.2d 610, the supreme court discussed the relationships of parties in a group insurance policy. A group insurance policy is a contract between an insurer and a central entity for the benefit of a group of people that has some relationship to the central entity.  By its nature, group insurance is a three-party relationship that inserts some central entity between the insurer and the insured. Members of a group insurance plan are generally not supplied with a complete copy of the master policy but are instead given a certificate of insurance that describes the master policy. The relationship between the insurer and the member

---

[63]*See Succession of Fannaly*, 805 So.2d at 1135;  La. Civ.Code art. 2045.

[64]*See* La. Civ.Code art. 2047.

[65]*See* La. Civ.Code art. 2046.

[66]*See* La. Civ.Code art. 2056; *Succession of Fannaly*, 805 So.2d at 1135.

[67]*See Marcus*, 740 So.2d at 606.

of the group is contractual in nature. Thus, the group policy issued to the central entity and the certificate of insurance issued to the member of the group, together, constitute the contract of insurance between the parties. *See In re Louisiana Health Service and Indem. Co.*, 98-3034 at 6-7, 749 So.2d at 614.[68]

The Louisiana Supreme Court's definition of group insurance is substantially similar to the description in *Couch on Insurance*, to wit:

> Group insurance involves three parties: the employer or other "central entity," the insurer, and the insured group members. A group insurance policy is the contract between the insurer and an employer, association, creditor, or some other central entity, for the benefit of a group of people that have some relationship to the central entity, such as employees, association members, or debtors.[69] It is important to understand the role each party plays in a given claim, as well as how common law and statutory law affect each of the parties. Rather than being the insurer or the insured, the central entity is more like a policyholder, despite the fact that the parties themselves may refer to each other using different terms. The central entity has the chief contractual relationship with the insurer and *usually* pays either part or all of the premiums.
> Understanding the central entity is key to understanding group insurance. For example, different statutes and regulations governing eligibility and other terms of the plan may apply, depending on whether the central entity is an employer, union, or professional association. In addition, certain statutes and common-law principles may apply only to group policies, while separate rules may govern other types of policies.[70]

The district judge has ruled on the basis of the summary judgment record that the plaintiff was "Totally Disabled" at all pertinent times. In light of that finding and the clear terms of the House Policy, regardless of whether the plaintiff also meets the definition of "partially disabled" or was paid any such a benefit, House is only entitled to be paid benefits for Total Disability

---

[68]*Clements v. Folse ex rel. Succession of Clements,* 830 So.2d 307, 312 (La. App. 1st Cir.), *cert. denied,* 829 So.2d 437 (La. 2002).

[69]*Id.*, at 312.

[70]*Couch on Insurance* § 7.1  (2005 Thomson/West) (citations omitted) (italicized emphasis added).

post-termination (2-28-02).  Lest this case go on in perpetuity, this Court further finds that AUL

has unquestionably waived any right it may have to insist that the House Policy terminated at any

point in time prior to February 28, 2002.  With regard to the briefing of this issue, AUL was

given two opportunities to raise any issue it had with respect to "termination" of coverage,

whether "individual termination" or "termination of the participating unit (i.e, the House,

Kingsmill firm)."  It failed to do so.

This Court's conclusion regarding benefits due and owing under the House Policy is

based upon the following clear and unambiguous language limiting coverage and benefits

payable under the policy/certificate of insurance, to wit:

(1)     the Section 8 "Insuring Provision," which states that the Partial Disability Benefit
        and the  Return to Work Benefits will continue only until "the date that the
        Participating Unit's coverage under the policy terminates," *inter alia*, whichever
        is earliest;[71]

(2)     the Section 5 "Individual Termination" provision, which states that a Person will
        cease to be insured upon the date that the Participating Unit's coverage under the
        Policy terminates;[72]

(3)     the Section 5 "Termination" provision, which states when and under what
        circumstances Insurance for a Participating Unit terminates;[73]

(4)     the Section 5 "Extended Benefit" provision, which states that "[i]f the Person is
        Totally Disabled on the date of the termination of insurance, AUL will pay
        benefits for Total Disability" and that termination of the policy or coverage for a
        participating unit will be without prejudice to any claim originating prior to
        termination;[74]  and

---

[71]House Policy at Section 8, p. 0027.

[72]*Id.*, at Section 5, p. 0015.

[73]*Id.*

[74]*Id.,* at p. 0016.

(5)   notification on the certificate of insurance issued to House, which provides that the Group Policy determines all rights and benefits in the certificate and may be discontinued at any time by agreement between AUL, the Group Policy Holder and the Participating Unit without notice to the employee.[75]

The aforesaid provision comports with Louisiana law applicable to policies or contracts of group health or accident insurance.  Passed in 1985, La. R. S. 22:215(A)(1)(d) provides:

> Except as may be otherwise provided in the policy or contract of group health and accident insurance or by R.S. 22:228, the policyholder and the insurer may agree to modify, amend, or cancel the group policy, and such agreement shall be binding upon the employee or member insured under the group policy, provided that the modification, amendment, or cancellation shall be without prejudice to any claim for benefits accrued, or for expenses incurred for services rendered, prior to such modification, amendment or cancellation. *Benefits and expenses incurred shall be limited as defined and limited by the terms of the policy ....*[76]

In this regard, the "Insuring Provisions" of the subject  group policy do <u>not</u> provide coverage for Partial Disability post-termination.[77]

Plaintiff also seeks statutory relief under La.R.S. 22:213(B)(7), contending that the aforesaid statute prohibits AUL from terminating or modifying his insurance coverage after he becomes disabled.   AUL counters that it can discontinue benefits, relying on La.R.S. 22:215(A)(1)(d), which regulates the termination and modification of group insurance policies.

Most notably, not unlike La. R. S. 22:215(A)(1)(d),  La.R.S. 22:213(B)(7) as amended similarly provide that benefits and expenses incurred shall be defined and limited by the terms of the policy, to wit:

_____

[75]*See* Certification of Insurance (Group Long Term Disability Insurance) issued to House effective 05/01/00, at p. 0001.

[76]La. R. S. 22:215(A)(1)(d) (italicized emphasis added).

[77]House Policy at Section 8, p. 0027.

(7) Cancellation: The insurer may cancel this policy at any time subject to the provisions of R.S. 22:228.[78] Such cancellation shall be by written notice, delivered to the insured, or mailed to his last address as shown by the records of the insurer, shall refund the pro rata unearned portion of any premium paid, and shall comply with the provisions of R.S. 22:636(F). Such cancellation shall be without prejudice to any claim for benefits accrued or expenses incurred for services rendered prior to cancellation. *Benefits and expenses incurred shall be as defined and limited by the terms of the policy.* The insured may likewise cancel this policy on the above terms. Upon cancellation by the insurer, however, the insurer shall only be liable for any claim for benefits accrued, or for expenses incurred for services rendered, subsequent to the cancellation date if the subsequent claim is for an illness or condition which was the basis of any claim prior to cancellation and for which the insurer had notice and if the policy of insurance is cancelled for reasons other than failure of the policyholder to pay premiums or failure of the insured to maintain eligibility as provided in the policy. Upon the written request of the named insured, the insurer shall provide to the insured in writing the reasons for cancellation of the policy. There shall be no liability on the part of and no cause of action of any nature shall arise against any insurer or its agents, employees, or representatives for any action taken by them to provide the reasons for cancellation as required by this Paragraph. (italicized emphasis added).

The coverage terms of the House policy provide for no Partial Disability benefit/coverage post-termination.[79]   The only applicable "Extended Benefit" – *i.e.*, post-termination benefit – bargained for is "Total Disability" coverage.  More particularly, the policy provides: "If the Person is Totally Disabled on the date of the termination of insurance, AUL *will pay* benefits for Total Disability."[80]

---

[78]In 1989, the legislature amended section 22:213(b)(7), making it clear that an insurer must continue medical coverage form an insured who has been diagnosed with a terminal illness, by adding reference to La. R. S. 22:213(B)(7). La. R. S. 22:228(A) provides that if an insurer cancels a group health policy after an insured has been diagnosed with a terminal illness, it must offer the insured a converted policy that will pay all medical expenses incurred as a direct result of the illness.

[79]*See* House Policy at Section 8, p. 0027.

[80]*Id.*

AUL's citation of *Massachusetts Mutual Live Insurance Company v. Nails,* 549 So.2d 826 (La. 1989) controls the disposition of this issue.   In the present case, coverage was not terminated due to cancellation, nor due to change in coverage or in rates after the contract was entered into.   Borrowing language from the *Massachusetts Mutual* case, "[i]nstead, [Partial Disability] coverage expired/[terminated] due to ordinary policy limitations incorporated into a bargained for insurance contract."[81]

The distinction between *cancellation* by the insurer and *termination* pursuant to policy provision is well-established in Louisiana jurisprudence. The Louisiana Supreme Court emphasized this distinction in *Massachusetts Mutual,* to wit:

> [W]e discern a distinct and important difference between "cancellation" of an insurance contract by the insurer and "termination" of coverage under a contract of insurance.  "Cancellation" connotes the termination of coverage under an insurance contract, before the contractual termination date of coverage, with or without cause, by unilateral action of the insurer. La. R.S. 636.  On the other hand, "termination" of coverage connotes cessation of coverage under an insurance contract by reason of passage of the policy period or the occurrence of some event anticipated by the terms of the contract.[82]

Plaintiff's reliance on *Waldrip v. Connecticut National Life Ins. Co.*, 573 So.2d 1172 (La. App. 5th Cir. 1991) is misplaced.  *Waldrip* involved an insurance company's unilateral cancellation of insurance as opposed to the termination of insurance by the Participating Unit and

---

[81]*Massachusetts Mutual Live Insurance Company v. Nails,* 549 So.2d 826, 830 (La. 1989) (citing the appellate court's opinion in *Massachusetts Mutual Live Insurance Company v. Nails,* 539 So.2d 797, 799 (La. App. 3rd Cir. 1989)).  *See e.g., Loria v. Children's Hospital*, 2003 WL 22038424 * 9 (E. D. La. Aug. 28, 2003) (Africk, J.) (noting that, taken as a whole, the language of the provision unambiguously provides that insurance terminates, when employment terminates, except in certain enumerated circumstances).

[82]*Massachusetts Mutual,* 549 So.2d at 830 (*quoting Mezzacappo v. Travelers Ins. Co.*, 523 So.2d 291 (La. App. 3rd Cir. 1988)).

cessation of certain benefits pursuant to a contractual term.

Plaintiff's citation of *Soniat v. Travelers Ins. Co.*, 538 So.2d 210 (La. 1989), which involved a group health insurance policy, is also inapposite. The *Soniat* result turned on the applicability of the "cancellation" provision as set forth in La. R. S. 22:213(B)(7) and involved a claim for payment of "medical expenses." The precise holding of the *Soniat* court was that the "without prejudice" provision of Section 213(B)(7) does not apply only to expenses for medical services rendered before the date of cancellation, but applies also to services related to the condition of which the insurer was aware before it cancelled the policy.[83]

The *Soniat* court acknowledged that Section 213(B) (7) "cancellation" and "termination" are two distinct acts which involve significantly different requirements and consequences.[84] The court further noted that the record in that case "clearly established that the policy was *cancelled* for non-payment of premiums prior to Soniat's termination of employment."[85] Both *Waldrip* and *Soniat* adhere to the pronouncement in the seminal Louisiana case, *Cataldie v. Louisiana Health Service and Indemnity Co.*, 433 So.2d 367 (La. App. 1983), *aff'd*, 456 So.2d 1373 (1984), involving an insured's claim under a health/accident policy for medical expenses/services  arising from a condition that occurred before the date of cancellation.

---

[83]*See Soniat v. Travelers Insurance Company*, 538 So.2d 210, 215 (La. 1989) (*citing Caltaldie v. Louisiana Health Service & Indemnity Co.*, 456 So.2d 1373 (La. 1984) and holding that cancellation was without prejudice to Soniat's claim for medical expenses of the pregnancy, a risk which was realized prior to cancellation of the policy).

[84]*Soniat,* 538 So.2d at 215 n. 12.

[85]*Id.,* at 215 (emphasis added).

As previously mentioned in the context of "group" vs. "individual" coverage, the result that plaintiff seeks – coverage for Partial Disability post-termination – would require wholesale reformation of the contract. The insuring provisions of the contract quoted above *in extenso* clearly exclude the possibility of coverage of Partial Disability post-termination and unambiguously provide that the Partial Disability Benefit will continue only until the *earliest* of a number of occurrences, including the date that the Participating Unit's coverage under the policy terminates.[86] There could not seemingly be a clearer limitation on Partial Disability coverage written into this policy. Partial Disability Benefits continue only up until termination of the policy and an Insured who has received the maximum benefit for such a covered loss cannot extend *that* benefit. Additionally, the waiver of premium provisions have no effect on entitlement to benefits.

Because plaintiff was "Totally Disabled" and payment of Total Disability Benefits are not affected by termination (if the insured is totally disabled on the date of termination), coverage terms require that AUL pay such benefits. The district judge held and the law of the case is that the plaintiff was Totally Disabled at all pertinent times.

There is no ambiguity in the terms of the policy relating to termination of the benefit period and the disability coverage provided by the House Policy is not illusory. Disagreement as to the meaning of this contract does not make it ambiguous. To expand the policy's coverage to exclude *limitations on coverage* of Partial Disability would be tantamount to assigning the defendant a risk that it did not initially foresee when issuing the policy to House, a result which

---

[86]House Policy at Section 8, p. 0027.

30

would not be tenable.[87]   The House Policy is worded such that it has a certain and definite legal meaning and thus it should be so construed as a matter of law.

### 3. Penalties

There is no question but that penalties are due in the same amount as benefits owed up to the month of December of 2003, when AUL commenced paying benefits under the policy and then conditionally tendered $36,433.53 as past due benefits due pursuant to the rulings of the district judge.[88]   As previously mentioned, AUL tendered certain payments which House rejected and returned to AUL.  This Court is of the opinion that, regardless of the reason, it would have been a vain and useless effort to tender any further payments, since it was clear that AUL's benefit checks would be returned.

In addition to the foregoing reasons, this Court's recommendations are mindful of the following particulars:

(1) the plaintiff's election of the greatest benefit available to him under the terms of the House Policy;

(2) the findings of the district judge, including that the plaintiff is entitled to only one Monthly Benefit;

(3) the only Monthly Benefit available to Plaintiff post-termination (February 28, 2002) is "Total Disability Benefits" *via* the "Extended Benefit" clause;

---

[87]*See e.g., Copes v. American Central Insurance Co.,* 2004 WL 75454 * 3 n. 2 (5th Cir. La. Jan. 15, 2004) (*per curiam*) (*citing Bondona v. Guccione,* 362 So.2d 740 (La. 1978) for the proposition that a policy may not be reformed when the risks assumed would substantially greater and different in nature).

[88]This Court will not again reiterate findings of the district judge in this regard, but instead refers to background section of this report at pp. 6 and 7.

31

(4) at all pertinent times, Plaintiff met the definition of Total Disability;

(5) the House Policy's terms, which provide that AUL **will pay** Total Disability Benefits, if the insured is totally disabled on the date of termination;

(6) income from other occupation or employment that the Plaintiff receives while he is Disabled and receiving <u>no</u> Monthly Benefit does not meet the House Policy's definition of "earnings" as "Other Income Benefits;" and

(7) consistent with the district judge's findings, "earnings" which qualify as "Other Income Benefits" shall serve to reduce the Monthly Benefit owed consistent with the House Policy's coverage/insuring provisions.

Accordingly,

**IT IS RECOMMENDED** that, subject to a credit in the amount of $36,433.53 previously paid by AUL, it should be ordered to pay the following sums to the Plaintiff, to wit:

(1) **Disability/Extended Benefits**[89] **for the period of October of 2001 through November of 2003** are due in the amount of <u>$260,000.00</u> together with statutory penalties in an equal amount of <u>$260,000.00</u>, for a **total amount due of $520,000.00 plus legal interest;**[90] <u>and</u>

(2) **Disability/Extended Benefits for the period of December of 2003 through March of 2005** are due **in the total amount of <u>$19,058.42</u>.**[91] This amount *includes interest* and

---

[89]The law of the case is that House met the definition of both Total Disability and Partial Disability. Because the offset for "Other Income Benefits" is inapplicable under the circumstances outlined above for this period, the resulting of the calculation is the same Monthly Benefit in the amount of $10,000.00, with a corresponding amount as penalties.

[90]*See* Addendum I to this Report and Recommendation.

[91]*See* Addendum II to this Report and Recommendation.

consistent with the policy terms the Extended Benefit continues to accrue monthly consistent with the terms of the House Policy up to the "Maximum Benefit Duration."

### 4. Attorney's Fees and Costs

Defendant contends that an award of $175,000 is grossly excessive, considering that the case that was decided on summary judgment based upon an administrative record provided through Rule 26 disclosures.   In this regard, defendant highlights that there were no depositions, no out-of-state travel and no significant discovery.   AUL argues that the amount is roughly triple the amount of fees charged by defense counsel.   Defendant further argues that it should not be penalized by plaintiff's retrenchment, first seeking Total Disability Benefits and then Partial Disability Benefits, upon finding the former unsatisfactory.   AUL contends that the plaintiff failed to exercise billing judgment, citing only two instances, to wit: preparation for a conference before the district judge; and preparation for the conference scheduled by the undersigned Magistrate Judge on January 20, 2005.[92]   Finally, the defendant submits that plaintiff should not be allowed reimbursement for arguments/issues raised, which were rejected.[93]

Plaintiff points out that his application for fees is pursuant to Louisiana's penalty statute, La.R.S. 22:657, and notes that the Fifth Circuit affirmed an attorney's fee award of $122,264.02 in an ERISA case utilizing the lodestar method.[94]   Plaintiff submits that the complexity of the

---

[92]AUL specifically notes that 5.4 hours of preparation for a status conference before the district judge and 10.1 hours to prepare for the January 20, 2005 conference before the undersigned is excessive, since nothing occurred in the case between these conferences.

[93]See Defendant's Memorandum filed May 20, 2004 [Rec. Doc. No. 66]; Defendant's Memorandum filed March 21, 2005.

[94]See Plaintiff's Memorandum filed May 20, 2004 *(citing Lain v. UNUM Life Insurance Co. of America*, 279 F.3d 337 (5th Cir. 2002)) [Rec. Doc. No. 65]; Plaintiff's Memorandum filed

choice of law/ coverage issues, the scope of the case and the stumbling blocks thrown in the Plaintiff's course to keep him from receiving the benefits owed under the subject contract of Long Term Disability Insurance more than substantiate the time and effort expended and the fees charged therefor.  House refers the Court to the hundreds of pages of memoranda and thousands of pages of exhibits, addressing issues including whether the plaintiff was Total Disabled, Partially Disabled, or both (AUL having paid neither benefit), the application of ERISA or Louisiana law, AUL's arbitrary and capricious failure to pay any benefit due under the policy, termination of benefits, and the calculation of benefits, penalties, interest, attorney's fees and costs.  Plaintiff further highlights that three settlement conferences were convened by two different Magistrate Judges and three separate extensive opinions issued by the district judge on the various issues inherent in this case.

At the outset, the Court observes that this has been hard-fought battle regarding overdue Long Term Disability Benefits.  Having reviewed the record in its entirety, the undersigned Magistrate Judge is not persuaded by AUL's argument that the plaintiff's attorney's fees should be *greatly* reduced.

Considering the district judge's opinions, countless memoranda and the reams of documentation which spawned the court's rulings and culminated in the subject application and reference, the undersigned Magistrate Judge and his staff have well-over fifty (50)  hours collectively invested in just the hind side of this fray.   In retrospect, it simply cannot be said that this time was not well spent, nor can this Court agree that less would have been either better or sufficient.

_____

February 22, 2005.

34

Teasing the facts out of the administrative record relevant to the issues presented in this case has proved nothing less than a monumental chore for both the litigants, the district judge and the undersigned.  Usually, claims for benefits under a policy of insurance (disability or otherwise), whether governed by Louisiana law or ERISA, are decided on the basis of one set of cross motions for summary judgment.  Hardly the usual fare, this case involved multiple motions and multiple briefing schedules, culminating in three lengthy opinions by the district judge.[95] After what then appeared to be the final dispositive ruling on April 24, 2004, even more coverage issues surfaced in the context of the damage calculus, which are addressed in this lengthy report.

Most notably, based upon its own investigation of the premises, the insuring provisions, limitations on coverage and definitions set forth in the policy, this Court determined that it was necessary for the parties to invest even more time so that a comprehensive report addressing all of the permutations of this particular disability policy's coverage and benefits would in fact issue.[96]   Specifically, AUL raised the issue of "termination" of the participating unit  –  a coverage issue affecting the damage calculus – after all three of the district judge's summary judgment rulings issued.  Insofar as "termination" is a coverage issue, it need not be raised as a defense and was not specifically raised in the defendant's answer (as a defense).  Louisiana's statutory and jurisprudential law on that issue (termination vs. cancellation) alone is a thicket and required considerable research, consideration and attention to the details of the House Policy.

---

[95]See Affidavit of Felix R. Weill at paras. 9-12 (fairly representing that essentially two separate sets of cross-motion for summary judgment plus AUL's final cross motion for summary judgment were filed and all the while extensive trial preparations ensued including filing of witness and exhibit lists) [Plaintiff's Exhibit "D" to First Supplemental Memorandum/Rec. Doc. No. 74].

[96]See Order dated April 7, 2005 [Rec. Doc. No. 76].

At the outset, plaintiff sought both Total Disability and Partial Disability Benefits, alternatively, because both coverages were arguably available under the policy and AUL refused to pay any Monthly Benefit.  A serious commitment of time was necessary to meet the rigors of the numerous motions for summary judgment. By and large, the plaintiff ultimately prevailed on his claims for an award of (1) benefits under the House Policy, (2) penalties pursuant to the La. R. S. 22:657 for AUL's arbitrary and capricious denial of coverage/failure to pay any benefits under the policy and (3) attorney's fees/costs.

Utilizing the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, (5th Cir. 1974) (the lodestar method), plaintiff's counsel submits that the fees sought are reasonable.  As of the time of filing, the total time dedicated to the prosecution of plaintiff's claims by counsel is as follows:

| Attorney | Hours | Rate | Total Fees |
|----------|-------|------|------------|
| Felix R.Weill | 624.2 | $200.00 | $124,840.00 |
| David G. Koch | 21.5 | $200.00 | $  4,300.00 |
| Paralegals (Huet/Williston) | 376.7 | $ 80.00 | $ 30,136.00 |
|  |  |  | $159,276.00 |
| COSTS |  |  | $  1,689.03 |
|  |  |  |  |
| TOTAL |  |  | $160,965.03 |

Plaintiff's counsel submits that, when all is said and done, he expects that attorney's fees will amount to approximately $175,000.00. This Court will only deal with the immediate fee bill. Any additional sums must be documented in accordance with the rules of this Court governing fee applications.

## A. The Lodestar Approach

A prevailing party may recover only those fees that are reasonably expended on the litigation. *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983); *Watkins v. Fordice*, 7 F.3d 453, 458 (5th Cir.1993). A party is not entitled to attorney's fees for the prosecution of an unsuccessful claim unless it involves common facts or derives from related legal theories of another claim that is successfully prosecuted. *See Hensley*, 461 U.S. at 434. The determination of a reasonable attorney's fee award involves a two-step process.[97] *See Rutherford v. Harris County*, 197 F.3d 173, 192 (5th Cir.1999).

In assessing the reasonableness of attorney's fees, the court must first determine the "lodestar" by multiplying the reasonable number of hours expended and the reasonable hourly rate for each participating attorney. *See Hensley*, 461 U.S. at 433; *Green v. Administrators of the Tulane Educational Fund,* 284 F.3d 642, 661 (5th Cir. 2002); *Migis v. Pearle Vision, Inc.*, 135 F.2d 1041, 1047 (5th Cir.1998); *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir.), *cert. denied*, 516 U.S. 862 (1995). The fee applicant bears the burden of proof on this issue. *See Riley v. City of Jackson*, 99 F.3d 757, 760 (5th Cir.1996); *Kellstrom*, 50 F.3d at 324; *In re Smith*, 996 F.2d 973, 978 (5th Cir.1992).

Turning to the contemporaneous time records submitted by counsel, the defendant's objections previously noted in detail above are that, for reasons previously stated, a fully compensatory fee would be unfair and excessive in light of the fact that this was by and large a

---

[97]The two-step process set forth in the following paragraphs is the normal process that a court must undertake to determine an appropriate attorney's fee award. The court follows this process, but makes a necessary adjustment, for reasons discussed below, to reflect fairness.

paper case and there has been a failure to exercise billing judgment.[98]   AUL does not dispute the reasonableness of the hourly rates charged by plaintiff's counsel.

This Court has been given no reason to doubt that the hourly rate (*i.e.*, $200.00 an hour) is consistent with counsel's ability, competence, experience, and skill.  Considering the prevailing market rates discussed in the plaintiff's submissions, the aforesaid hourly rates cannot be characterized as unreasonable.

The issues inherent in the present motion do not fairly permit a line-by-line analysis. However, this Court has reviewed the docket sheet and the billing statements submitted by the plaintiff and does not find that there are any instances of failure to exercise billing judgment.  As to the two instances highlighted by AUL, this Court is not inclined to discount the fees charged by the plaintiff.  Indeed, some of the most difficult issues arose post-summary judgment and are addressed in this Court's report.  It was no small task and, as previously noted, even post-briefing the determination of certain substantive issues required that the undersigned put the parties to task once again.  Essentially, what the defendant contends was enough *was not enough.*

### B. The *Johnson* Factors

The court must consider whether the lodestar should be adjusted upward or downward, depending on the circumstances of the case and the factors set forth in  *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974).  *See Green*, 284 F.3d at 661; *Cobb v. Miller*, 818 F.2d 1227, 1232 (5th Cir.1987).  The twelve factors are: (1) the time and labor

---

[98]Billing judgment is demonstrated by the attorney writing off unproductive, excessive or redundant hours. *Green,* 284 F.3d at 662.  The remedy for failing to exercise billing judgment is to reduce the hours awarded by a percentage, unless it is feasible to undertake the meticulous analysis, line-by-line, with an eye towards compensating for the lack of billing judgment. *Id.*

required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal

service properly, (4) the preclusion of other employment by the attorney due to acceptance of the

case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations

imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9)

the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11)

the nature and length of the professional relationship with the client, and (12) awards in similar

cases. *Johnson*, 488 F.2d at 717-19.

While the court's analysis need not be meticulously detailed, it must articulate and clearly

apply the *Johnson* criteria. *Riley*, 99 F.3d at 760 (*quoting Kellstrom*, 50 F .3d at 331). To the

extent that any of the *Johnson* factors are subsumed in the lodestar, they should not be

reconsidered when determining whether an adjustment to the lodestar is required. *Migis*, 135

F.3d at 1047. The most critical factor in determining the reasonableness of an attorney's fee

award "is the degree of success [or result] obtained." *Hensley*, 461 U.S. at 436; *Farrar*, 506 U.S.

at 114.[99] Moreover, an applicant must show that billing judgment was exercised, so that the

court may determine the number of hours reasonably expended on a case. *Green*, 284 F.3d at

662 (*citing Walker v. HUD*, 99 F.3d 761, 769 (5th Cir. 1996)).

At the outset, this Court notes that when a party achieves partial success, *total* reliance on

and use of the lodestar method may not be appropriate. In this regard, the Supreme Court

observed:

---

[99]*See also Giles v. General Elec. Co.*, 245 F.3d 474, 491 n. 31 (5th Cir.2001) (stating that
the most important factor under the *Johnson* analysis is the result obtained); *Migis*, 135 F.3d at
1047.

> If ... a plaintiff has achieved only partial or limited success, the product of hours
> reasonably expended on the litigation as a whole times a reasonable hourly rate
> may be an excessive amount. This will be true even where the plaintiff's claims
> were interrelated, nonfrivolous, and raised in good faith. Congress has not
> authorized an award of fees whenever it was reasonable for the plaintiff to bring a
> lawsuit or whenever conscientious counsel tried the case with devotion and skill.
> Again, the most critical factor is the degree of success obtained.

*Hensley*, 461 U.S. at 436.[100]  In a case where an applicant has achieved only limited or partial

success, once a court considers the "amount and nature of damages awarded, [it] may lawfully

award low fees or no fees without reciting the 12 [*Johnson* ] factors bearing on reasonableness,"

or without computing the lodestar. *Farrar,* 506 U.S. at 115.  Regardless of the analytical

framework utilized, the fee award must be the result of a "measured exercise of discretion" on the

court's part. *Id.* at 114.

In this case, the Court finds that the lodestar computation set forth above is an appropriate

starting and ending point.  As explained more fully below, this court has fully considered the

applications at issue in light of the teachings in *Hensley, Farrar*, and *Migis*, *supra*, and

determined that only one adjustment is appropriate *i.e.*, the amount involved and overarching

success of the plaintiff (factor eight).  It is noteworthy that the *Johnson* analysis has been

augmented or amended since its formulation.  The Supreme Court has "barred any use of the

sixth factor" and thus, the contingent nature of the case cannot serve as a basis for enhancement

of the fee.  *See Walker v. U. S. Department of Housing and Urban Development,* 99 F.3d 761,

---

[100]*See also Migis*, 135 F.3d at 1048 (applying the principle enunciated in *Hensley* and
remanding an award of attorney's fees because the district court failed "to give adequate
consideration to the result obtained relative to the fee award, and the result obtained relative to
the result sought").

772 (5th Cir. 1996) (*citing Burlington,* 505 U.S. at 567).[101]  In addition, the court's application of

the *Johnson* factors is limited to those factors that have not already been addressed through the

court's calculation of the number of reasonable hours and rate per attorney. *Migis,* 135 F.3d at

1047; *Watkins,* 7 F.3d at 459.

In this vein, the Fifth Circuit has warned that the first factor  (time and labor involved)

and  the seventh factor (time limitations imposed by the client or the circumstances) are

especially susceptible to "double counting." *Walker,* 99 F.3d at 771, 772.  More recently, the

Fifth Circuit held in *Shipes, supra,* that the novelty and complexity of the issues (factor two), the

special skill and experience of counsel (factor three), the results obtained from the litigation

(factor eight), and the quality of representation (factor nine) are presumably fully reflected in the

lodestar amount. *Shipes,* 987 F.2d at 322.  Upward adjustments to the lodestar are proper only

in certain "rare and exceptional cases." *Pennsylvania v. Delaware Valley Citizens' Council for

Clean Air,* 478 U.S. 546, 565 (1986).  The parties in the case at bar do not suggest that this is one

of those cases.

Turning to a few of the important factors (*i.e.,* factors one, two, three and nine), these

factors have already been considered in calculating the lodestar.  The Court therefore determines

that no revision of the lodestar computation is warranted based on these factors. Specifically

addressing the novelty or difficulty of the issues (factor two), it is noteworthy that the *legal*

questions involved and considered by the trial court required three sets of motions for summary

judgment.  Even then, not all dispositive issues affecting coverage were either raised or addressed

---

[101]*See also Shipes v. Trinity Indus.,* 987 F.2d 311, 323 (5th Cir. 1993) (the contingent
nature of a case cannot serve as a basis for enhancement of attorney fees).

to the district judge in the first instance.

In this Court's view, the issues of policy interpretation proved to be quite difficult. The submissions of the parties at this damage stage of the proceedings raised even more questions than answers. Regarding the House Policy's terms, this Court was unable to find one case addressing the House Policy's definition of "Other Income Benefits" as earnings the insured receives while he is disabled and receiving a monthly benefit. Additionally, no case was unearthed "on all fours," pairing the aforesaid definition with the facts presented (more than a two-year hiatus in Monthly Benefits), a circumstance most apparently excepted from the definition of "Other Income Benefits" as "earnings."

This Court is persuaded by the Plaintiff's argument that the legal issues inherent in the determination of coverage and the damage calculus can hardly be described "easy." Indeed, complex questions deserve more than a facile answer. Additionally, with the exception of the issue of "termination" of partial disability benefits and offsetting earnings received by the disabled insured while he was receiving a monthly benefit, AUL did not prevail. Although at one point it did in fact appear to House that he had won the battle and lost the war, that was fleeting. Nevertheless, that war was waged on a number of fronts because AUL refused to pay any benefits under the policy and did not raise the issue of termination until the summary judgment trilogy had ended. From the outset, House pursued Total Disability Benefits and alternatively, Partial Disability Benefits and the district judge so noted.

Nevertheless, the novelty and complexity of the issues (factor two), together with the special skill and experience of counsel (factor three) and the quality of representation (factor nine) are presumably fully reflected in the lodestar amount. *Shipes*, 987 F.2d at 322. For the

42

foregoing reasons, the Court believes that no adjustment is warranted on the basis of these

factors.

As to time limitations imposed by the client or the circumstances (factor seven), the case

at bar does not appear to be a significant consideration.  There is no argument that plaintiff's

counsel was retained in haste, ultimately, there was no trial on the merits and the case has

remained a fixture on the court's docket for well-over two years.  Under the circumstances, this

Court believes that no adjustment is warranted pursuant to the seventh *Johnson* factor.

Factors nine through twelve also warrant no adjustment under the circumstances.  To the

degree that the case could be considered undesirable due to any number of various factors recited

by the plaintiff, these considerations have already been covered under factor two and in the

hourly rates assigned.  As aforestated, counsel's experience, ability and reputation was subsumed

in calculating the lodestar.

Lastly, consideration of eighth *Johnson* factor -  the results obtained -  does not require an

adjustment of the lodestar.  Generally, this factor is applied where there is partial success and to

reduce a fee award.  *Hensley v. Eckerhart,* 461 U.S. 424 (1983).  The plaintiff prevailed in large

measure, except as to the amount of benefits sought and only because of integration of earnings

which the plaintiff has received and may continue to receive that meet the criteria of "Other

Income Benefits" as defined in the House Policy.

This Court is not persuaded by the defendant's argument that the lodestar should  be

reduced on account of the fact that the coverage is not as complete as the plaintiff originally

envisioned or any other factor.  Albeit not a complete victory, the plaintiff prevailed in large

measure with respect to the most important issues and this is reflected in the proposed judgment,

43

awarding damages, penalties, interest and attorney's fees. The Court's determination in this regard is mindful of the Supreme Court's statement in *Hensley* that "[a] reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *Hensley*, 461 U.S. at 439.  Tasking the plaintiff to pay any portion of the attorney's fees accrued during this protracted litigation would only serve to further deprive the plaintiff of the benefit of his bargain.  Indeed, plaintiff purchased this "own-occupation" policy at a significant premium to insure that he would receive a guaranteed amount of income *on a monthly basis* in the case of Long Term Disability.  The district judge's discussion regarding AUL's La. R. S. 22:657 liability further bolsters this conclusion.

Having carefully considered the record in this case and the results obtained, the undersigned determines that no reduction of the amount of the lodestar would be appropriate under the circumstances. The Court makes this determination based on the record of the proceedings, its familiarity with the proceedings, the written submissions of the parties and the arguments of counsel.

For the reasons stated herein, the undersigned RECOMMENDS that the plaintiff should recover the full amount of  **$ 160,965.03**  ( *i.e.*, $159,276.00 attorney's fees <u>plus</u> costs in the total amount of $1,689.03) as reasonable attorney's fees and expenses necessarily incurred in the prosecuting his lawsuit seeking Long Term Disability Benefits, Penalties, Interest, Attorney's Fees and Costs against his insurer.[102]   In this Court's opinion, the plaintiff prevailed.

---

[102]*See* Supplemental Memorandum in Support of House's Calculation at pp. 10-12 and Exhibits D/D-2.

## V . SUMMARY OF RECOMMENDATIONS

For all of the foregoing reasons,

**IT IS RECOMMENDED** that, the plaintiff's application for attorney's costs be GRANTED in the full amount of **One Hundred Sixty, Nine Hundred Sixty-Five Dollars and Three Cents ($160,965.03)**.[103]

**IT IS FURTHER RECOMMENDED** that, subject to a credit in the amount of $36,433.53 previously paid by AUL, it should be ordered to pay the following sums to the Plaintiff as damages (disability benefits, penalties and interest), to wit:

(1) **Disability/Extended Benefits for the period of October of 2001 through November of 2003** are due in the amount of <u>$260,000.00</u> together with statutory penalties in an equal amount of <u>$260,000.00</u>, for a **total amount due of $520,000.00 plus legal interest**;[104] <u>and</u>

(2) **Disability/Extended Benefits for the period of from December of 2003 through March of 2005** are due **in the total amount of <u>$19,058.42</u>**.[105] This amount *includes interest* and consistent with the policy terms the Extended Benefit continues to accrue monthly consistent with the terms of the House Policy up to the "Maximum Benefit Duration."

(3) **Disability/Extended Benefits for the period post-dating March of 2005** may also be due in an amount to be determined by the parties based upon the plaintiff's earnings. Counsel for the parties should be directed to submit the proposed form of judgment consistent with the

---

[103]*See* Supplemental Memorandum in Support of House's Calculation at pp. 10-12 and Exhibits D/D-2.

[104]*See* Addendum I to this Report and Recommendation.

[105]*See* Addendum II to this Report and Recommendation.

foregoing.

## VI. OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this ⸺ day of July, 2005.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

**ADDENDUM I**

DISABILITY BENEFIT CALCULATION FOR THE PERIOD OF OCTOBER 1, 2001
THROUGH NOVEMBER 30, 2003 DURING WHICH PERIOD
THE PLAINTIFF WAS DISABLED BUT **RECEIVED NO MONTHLY BENEFIT**

| Year-Month | Monthly Benefit | Penalty |
|---|---|---|
| 2001-October | $10,000 | $10,000 |
| 2001-November | $10,000 | $10,000 |
| 2001-December | $10,000 | $10,000 |
| 2002-January | $10,000 | $10,000 |
| 2002-February | $10,000 | $10,000 |
| 2002-March | $10,000 | $10,000 |
| 2002-April | $10,000 | $10,000 |
| 2002-May | $10,000 | $10,000 |
| 2002-June | $10,000 | $10,000 |
| 2002-July | $10,000 | $10,000 |
| 2002-August | $10,000 | $10,000 |
| 2002-September | $10,000 | $10,000 |
| 2002-October | $10,000 | $10,000 |
| 2002-November | $10,000 | $10,000 |
| 2002-December | $10,000 | $10,000 |
| 2003-January | $10,000 | $10,000 |
| 2003-February | $10,000 | $10,000 |
| 2003-March | $10,000 | $10,000 |
| 2003-April | $10,000 | $10,000 |
| 2003-May | $10,000 | $10,000 |
| 2003-June | $10,000 | $10,000 |
| 2003-July | $10,000 | $10,000 |
| 2003-August | $10,000 | $10,000 |
| 2003-September | $10,000 | $10,000 |
| 2003-October | $10,000 | $10,000 |
| 2003-November | $10,000 | $10,000 |
| | $260,000       + | $260,000 |

**TOTAL DUE**
**FOR 10/01 through 11/03   = $520,000.00 plus interest**

**ADDENDUM II**

DISABILITY BENEFIT CALCULATION FOR THE PERIOD OF
DECEMBER, 2003 THROUGH MARCH, 2005 DURING WHICH PERIOD
<u>THE PLAINTIFF WAS DISABLED AND RECEIVED MONTHLY BENEFITS</u>[106]

| Year-Month | Monthly Benefit | Penalty | Interest | Total |
|---|---|---|---|---|
| 2003- December | $     0.00 | $ 0.00 | $ 0.00 | $     0.00 |
| 2004- January | $1,446.00 | $ 0.00 | $95.84 | $1,541.84 |
| 2004-February | $1,446.00 | $ 0.00 | $89.82 | $1,535.82 |
| 2004-March | $1,446.00 | $ 0.00 | $83.39 | $1,529.39 |
| 2004-April | $1,446.00 | $ 0.00 | $77.17 | $1,523.17 |
| 2004-May | $1,446.00 | $ 0.00 | $70.74 | $1,516.74 |
| 2004-June | $1,446.00 | $ 0.00 | $64.52 | $1,510.52 |
| 2004-July | $1,446.00 | $ 0.00 | $58.09 | $1,504.09 |
| 2004-August | $1,446.00 | $ 0.00 | $51.66 | $1,497.66 |
| 2004-September | $1,446.00 | $ 0.00 | $45.44 | $1,491.44 |
| 2004-October | $1,265.50 | $ 0.00 | $34.14 | $1,299.64 |
| 2004-November | $1,085.00 | $ 0.00 | $24.60 | $1,109.60 |
| 2004- December | $1,085.00 | $ 0.00 | $19.77 | $1,104.77 |
| 2005- January | $  626.00 | $ 0.00 | $ 8.23 | $  634.23 |
| 2005-February | $  626.00 | $ 0.00 | $ 5.35 | $  631.35 |
| <u>2005-March</u> | <u>$  626.00</u> | <u>$ 0.00</u> | <u>$ 2.16</u> | <u>$  628.16</u> |
|  | 18,327.50 | $ 0.00 | $730.92 | $19,058.42[107] |

**TOTAL DUE**
**FOR 12/03 through 3/05  = $19,058.42**[108]

---

[106]As previously discussed the Court determined that the offset for "earnings" is applicable because a Monthly Benefit was tendered/received, but the plaintiff refused same and returned the benefit checks to AUL.  Additionally, the undersigned Magistrate Judge determined that penalties should not be awarded post-unconditional tender of the amount that AUL reasonably believed due and owing under the law of the case at the time.

[107]These figures conform to the pertinent part of the Extended Benefit calculation submitted to the undersigned Magistrate Judge *via* Supplemental at Plaintiff's Exhibit "I" [Rec. Doc. No. 77].

[108]This amount includes interest for the period in question.